U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 MAY 21  PM 12: 56

CLERK
BY_____PM_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:11-cr-111 |
| | ) | |
| LILLIAN RAMOS | ) | |

## OPINION AND ORDER GRANTING DEFENDANT'S
## MOTION TO SUPPRESS EVIDENCE
(Doc. 14)

This matter came before the court on March 5, 2012 for an evidentiary hearing on Defendant's motion to suppress evidence. (Doc. 14.) Defendant is charged in a one count Indictment with knowingly and willfully conspiring to distribute Oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. § 846. Defendant seeks suppression of all evidence, including her statements, obtained as a result of an allegedly unlawful seizure and detention of her person and vehicle on January 14, 2010 in Brattleboro, Vermont by the Vermont State Police ("VSP"). The government opposes the motion and argues that the roadside detention of Defendant did not violate her Fourth Amendment rights, and that any statements Defendant provided were not the result of custodial interrogation.

After the hearing, on March 16, 2012, the parties submitted an unofficial transcript of the video from the traffic stop, including a timeline pinpointing significant events during the video. The government submitted post-hearing memoranda on March 19 and 22, 2012, and Defendant submitted a supplemental memorandum on March 22, 2012.

The government is represented by AUSA Michael P. Drescher. Defendant is represented by William E. Kraham, Esq.

## I. Factual and Procedural Background.

### A. Roadside Questioning.

On January 14, 2010 at approximately 8:25 p.m., VSP Trooper Christopher Lora was operating an unmarked police cruiser traveling southbound on I-91 in Brattleboro at approximately seventy miles per hour when he was passed by a vehicle with New Jersey license plates traveling at approximately eighty miles per hour. Trooper Lora called in the plate and determined it belonged to a rental car. He effectuated a stop of the vehicle without incident after following it for .6 miles. Thereafter, he approached the passenger's side of the vehicle and asked Defendant for her license, registration, and proof of insurance. He then asked, "Where are you guys coming from?" Defendant said they were coming from Vermont.[1] Trooper Lora responded, "No kidding, It's a big state. Anywhere specific?" Defendant stated that they were coming from Burlington. Trooper Lora then began questioning Defendant's passenger, asking for his first and last name and if he had any identification on him. When the male passenger displayed an operator's license, Trooper Lora took it from him.

While standing next to the stopped vehicle, Trooper Lora asked Defendant whose vehicle it was and she responded that it was a rental. He then asked twice "What's going on in Burlington?" Defendant responded they were visiting some friends. In response to Trooper Lora's questioning, Defendant further advised that they were headed to Newark, New Jersey and had been in Vermont for two days. Trooper Lora then asked Defendant if she knew why he had stopped her to which she responded "Because I was speeding?" Trooper Lora acknowledged this was the reason for the stop.

Trooper Lora testified that he observed Defendant's hand was shaking uncontrollably when she handed him her license and that the male passenger in the

---

[1] Defendant's response is less nonsensical than it may first appear as the court takes judicial notice of the fact that Brattleboro, Vermont is only approximately eleven miles from the Massachusetts border on I-91 and Trooper Lora stopped Defendant in "the area of mile marker 11.50." (Tr. 3/5/12 at 47). The court grants the parties fourteen (14) days from the date of this Opinion and Order to challenge the propriety of the court's taking judicial notice.

vehicle appeared nervous as well, as he was rubbing his hands and knees and rocking back and forth. He described the passenger's level of nervousness to be in excess of what he generally encounters with passengers. Trooper Lora did not observe any luggage in the passenger compartment of the vehicle.

### B. The Exit Order.

Approximately three minutes after the stop, Trooper Lora ordered Defendant out of her vehicle and into his cruiser so that they could talk.[2] At the court's hearing, Trooper Lora conceded that his direction to Defendant to exit her vehicle and sit in the cruiser was "not consensual. That was an order." (Tr. 3/5/12 at 80). He acknowledges that he did not advise Defendant she could refuse to comply with the order or refuse to talk to him in his cruiser. Trooper Lora described the reason for the exit order as follows: "Based on my observations at that point, the vague answers she give[s] me about the reason of the trip, I felt, um, there's something more going on than just a simple trip to Vermont." (Tr. 3/5/12 at 27).

When Defendant exited her vehicle, Trooper Lora told her that she could leave her purse "right in the car." He acknowledges that he made this suggestion "by design" because he did not want her to bring belongings into his cruiser. He further testified that it was his understanding that if Defendant's purse was in the vehicle, any authority to search the vehicle would extend to the purse. Defendant exited her vehicle and followed Trooper Lora to his cruiser where he briefly patted her down over her clothing and asked her if she had any weapons before they both entered the cruiser and sat down in the front seats.

While seated in the cruiser, Trooper Lora resumed his questioning of Defendant, asking her where she was from and how she knew the passenger in the car, where he was from, and whether he was living in New Jersey or Florida. In Defendant's presence, he

---

[2] At approximately 8:36:38 p.m. on the video recording of the stop, Trooper Lora said to Defendant: "Tell you what, why don't you hop out for me so I can chat with you, O.K.?" Defendant responded, "huh?" Trooper Lora repeated "I said hop out so I can chat with you, O.K.?" (Doc. 27-1 at 2).

advised dispatch of the Defendant's and her passenger's first and last name for a records check.

Trooper Lora again asked why Defendant and her passenger had been in Burlington and what they had done up there. Defendant responded that they had "hanged out" and "went to a friend's house and stuff." (Doc. 27-1 at 4). Trooper Lora asked for the friend's name, how long Defendant had known her, and whether they had just come up to visit her. Defendant identified her friend as "Mirabelle," told him that she had not known her long and knew her through other people, and confirmed that they came up to visit her. He asked if her passenger had come up from Florida, and whether he was staying in New Jersey now. When Defendant advised that he was staying in Brooklyn, Trooper Lora responded "OK, so you don't know where he lives?" *Id.* at 4. Defendant confirmed that she only knew it was either in the Bronx or Brooklyn.

Trooper Lora asked if Defendant had "ever been in trouble for anything before" to which Defendant responded "I have no record of no kind." *Id.* He then asked about whether Defendant's passenger had a record to which she responded "not that I know of but maybe." In Defendant's presence, Trooper Lora again radioed the dispatcher and after referencing Defendant's and her passenger's names, asked the dispatcher to "start a card for a suspicious" and "just run 29 III" on both subjects. He advised the dispatcher that he possibly wanted a canine officer to report to the stop when he was clear. At this point, he used only the code for the canine officer and did not make it clear to Defendant that a canine unit had been requested.

Approximately seven minutes into the stop, Trooper Lora was informed by dispatch that Defendant's license was valid, as was that of her passenger. Shortly thereafter, he obtained a criminal record check for both of them and determined that neither of them had a criminal record. He concedes that at this point, the initial purpose of the stop for speeding had been satisfied. He nonetheless retained Defendant's license and also retained the license of her passenger. He did not tell Defendant she was free to leave at this point and concedes "[s]he was being detained from my roadside investigation at that point." (Tr. 3/5/12 at 88).

4

Trooper Lora resumed questioning Defendant, asking her how long she had known her passenger, whether he had just decided to take a ride with her, where she was living, who rented the car, whether she had even been to Vermont before, and how often she came to Vermont. Defendant replied that she had only known her passenger for a couple of months and had met him through friends in the Bronx at clubs.[3] She stated that she had lived in Newark all of her life and worked there, and explained that she was on vacation from her job at a university which she identified by name and location. In response to further questioning, she advised that she came to Vermont once a month, that she visited the same person, and could not remember "Mirabelle's" last name.

Approximately eleven minutes after the initial stop, and while they were both seated in his cruiser, Trooper Lora issued Defendant a warning for speeding.[4] He decided to investigate further because, based on his training and experience, he saw Defendant's travel "to be more of a drug run than some vacation for the day." (Tr. 3/5/12 at 30). He asked if she had anything in the vehicle that she shouldn't have such as illegal narcotics or large sums of money. When Defendant stated "I have none of that," Trooper Lora noted that Defendant ceased to make eye-contact with him. Trooper Lora then asked whether Defendant's passenger had any of those items to which Defendant replied, "No." Trooper Lora asked Defendant about her luggage and she responded that she had a bag in the trunk. The following exchange ensued:

> **Trooper Lora**: O.K. Do you have a problem if I search the vehicle and make sure there's nothing in there?
>
> **Defendant**: Why would you search the vehicle--we didn't do nothing?

---

[3] Trooper Lora testified that "She didn't remember her passenger's last name . . . She doesn't know the passenger's last name yet she's traveled quite a distance with them. " (Tr. 3/5/12 at 33). This testimony is inconsistent with the cruiser recording which does not reflect that Defendant made these statements.

[4] Trooper Lora testified that he gave Defendant her identification and the warning at the same time. The audio recording does not reflect this exchange and the warning is dated for the following day January 15, 2010.

**Trooper Lora**: It's just the whole story just seems a little – a little odd to me. You're kind of traveling with somebody you don't really know, you're traveling to Vermont –

**Defendant**: I know him for a while.

**Trooper Lora**: Right. I'm just curious, it just seems a little odd to me, that's all. I just want to make sure there's nothing there. You're telling me there's nothing there –

**Defendant**: There's nothing – that I have to be, you know –

**Trooper Lora**: Sure.

**Defendant**: But – I don't see the point – why I need to be searched of my car, you know, we don't do drugs –

**Trooper Lora**: I understand where you're coming from, but do you understand where I'm coming from?

**Defendant**: I know, I understand you very well, you know, but I'm not having – you do – I was speeding – I understand that, but, you know – but other than that –

**Trooper Lora**: Right.

**Defendant**: You know, but why, should we get searched [unintelligible]

**Trooper Lora**: Well it's like I said. If there's nothing there, I do a quick search, you guys are on your way.

**Defendant**: Huh?

**Trooper Lora**: I said if I search and find nothing you guys are on your way.

**Defendant**: Yeah but why should I give you the okay? But I don't feel that I should give you the O.K. to search the car because –

**Trooper Lora**: O.K. Is there any reason that a canine would alert to the presence of narcotics around your vehicle?

**Defendant**: A canine, what is that, a dog?

**Trooper Lora**: A dog.

**Defendant**: For drugs?

**Trooper Lora**: Um-hum.

**Defendant**: No. I have – I don't have nothing – like if it's obligated, I
mean fine, I don't have no problem but –

(Doc. 27-1 at 8-9.) Thereafter, Trooper Lora continued to state that he found Defendant's
story "a little odd" and "concerning." He also told her twice that he had a canine coming
to check the vehicle. He advised her that she needed to "stand by" while he left the
cruiser to chat with her passenger. When Defendant asked if she could grab her phone,
Trooper Lora told her she could not.

Trooper Lora left the cruiser to question Defendant's passenger. Defendant's
passenger confirmed that they were visiting Defendant's friends in Burlington that he did
not know very well and that he knew Defendant only because she was his cousin's
girlfriend. Trooper Lora asked about the purpose of the trip and the passenger advised
that he travelled with Defendant so that he could visit his cousin in Burlington whom he
identified as "Junior Velasquez." He further advised that there were no illegal narcotics,
large sums of money, guns, or weapons in the vehicle and that a canine would not alert to
the presence of the narcotics in the vehicle. Trooper Lora directed the passenger to turn
off the vehicle and to "[h]ang tight." (Doc. 27-1 at 11.)

When Trooper Lora finished questioning the passenger, he returned to the cruiser
and resumed his questioning of Defendant, momentarily pausing in doing so in order to
again repeat Defendant's and her passenger's names for the dispatcher and ask for
assistance at the stop. Trooper Lora asked Defendant about her friend in Burlington, her
relationship with her passenger, and her rental of the vehicle. Defendant responded to
these questions. Trooper Lora reminded Defendant for a third time that he had another
trooper coming with a police dog that would do an exterior scan of the vehicle and alert
to the presence of narcotics. He told Defendant that although the decision whether to

consent was hers, "we'll wait 'till he gets here." (Doc. 27-1 at 14). He further advised
that if the dog alerted, it would give him probable cause to seize her vehicle and its
contents and apply for a search warrant and "obviously that's going to take some time[.]"
(Doc. 27-1 at 14). He then again asked for consent, indicating it was her choice but that
her passenger had given him a different view of what was going on. When Defendant
asked what the passenger said, Trooper Lora declined to tell her.

Trooper Lora told Defendant that he would not "jam her up" for something foolish
like a pipe. He implied that there might be a different outcome if he was forced to go
through the effort of obtaining a search warrant, stating "I don't try to jam people up too
hard on that, but, you know, I mean, if I got to go through the work of seizing the vehicle
and applying for a warrant and all this stuff, then, you know, we'll see what happens[.]"
*Id.* at 15. At that point, the canine unit arrived. Trooper Lora somewhat inaccurately
summarized the facts for Trooper Trudeau, the canine officer, as follows:

> "They passed me at 80. I got them just coming just below [unintelligible] I
> stop them. They're coming from Burlington. She's from Newark, New
> Jersey. She rented the car. This kid's from Florida. Don't know each
> other. Went to visit someone in Burlington for two days that they only
> know by first name. Now they give me conflicting stories about what the
> reason is. She says she's dating this guy, he's saying, no, it's his
> girlfriend's cousin, he's up there, he's saying they went up to visit a girl, I
> never get the same story, they're obviously, they're up to no good,
> whatever they're doing. She says she has no record, I'm waiting for the 29
> III on him. He's nervous. He's rubbing his hands down his legs, and he's,
> man I got to get out of the car, and his cousin is Junior Velasquez."

*Id.* at 15-16. Trooper Trudeau asked whether it is Junior Velasquez from Brattleboro.
Trooper Lora's response is unintelligible although in his testimony at the court's hearing,
Trooper Lora confirmed he believed it was. *See* Tr. 3/5/12 at 40 ("At the time, I thought
it was a person who we were familiar with in Brattleboro who was long-time suspected of
trafficking narcotics.").

Thereafter, Trooper Lora read a consent search card to Defendant and again asked
for consent to search her vehicle and its contents. In response, Defendant again told him
that she didn't see why she should consent to have her car searched for only speeding.

He asks her three more times, briefly, if she was withholding consent to which she responds in the affirmative.

### C. The Canine Alert, the Vehicle's Seizure, and Defendant's Further Detention.

Approximately twenty minutes after Trooper Lora issued a warning, after sniffing Defendant's vehicle, a certified canine alerted to the presence of narcotics in the vehicle in the rear trunk area. Trooper Lora advised Defendant of the alert and again asked for consent to search with the understanding that if consent was denied, he would seize the vehicle and apply for a warrant. Defendant advised several times that it was "impossible" that the canine alerted to drugs in the vehicle and said: "No I don't want you to search, I got to get an impound or whatever because I am going to prove that I don't have nothing and the dog is wrong[.]" (Doc. 27-1 at 20-21). When she asked if she could grab her cigarettes, she was told she could not.

Defendant was handcuffed and transported to the police station. She was advised that she was not under arrest and was merely being detained for "the purposes of a warrant." Despite her repeated requests to obtain her coat because she was cold, she was told she could not access it.

Troopers Lora and Trudeau, Defendant's passenger, and Defendant arrived at the barracks at 9:14 p.m., approximately forty-nine minutes after Trooper Lora initiated the traffic stop. En route Defendant asked what would happen if there were no drugs found in the vehicle and Trooper Lora advised she would be sent on her way.

In its Opposition, the government refers to certain incriminating statements Defendant allegedly made at the barracks without the benefit of *Miranda* warnings. The government advises that it "does not intend to use the statements Ramos made while she was at the barracks, [so] there is no evidence to suppress from that time and the Court need not consider whether she was in custody for *Miranda* purposes at that time." (Doc. 15 at 8).

At the barracks, Trooper Lora drafted an affidavit and other materials in support of a search warrant application. He testified that it was a couple of hours from the time he

9

started drafting it until he reached the residence of Vermont Superior Court Judge Karen Carroll.

### D. The Search Warrant.

Trooper Lora's affidavit in support of probable cause submitted to Judge Carroll contains several statements that are inconsistent with the recording of the stop. For example, he states that Defendant first mentioned "Mirabelle" when he approached Defendant's vehicle roadside and that he had specifically asked Defendant's passenger if they had visited "Mirabelle" and Defendant's passenger denied that they had done so and advised that they had, instead, visited his cousin "Junior." In fact, the conversation about "Mirabelle" was first raised in the police cruiser, Defendant's passenger was never asked about "Mirabelle," and Defendant's passenger had told Trooper Lora that they went to Burlington to see some of Defendant's friends and that he came along to see his cousin Junior Velasquez.

In his affidavit, Trooper Lora further states that: "I asked Ramos if she would have a seat in my car so I could speak with her further about her trip. I advised Ramos she did not have to allow this." (Doc. 15-1 at 3). Trooper Lora admitted that this statement was inaccurate and explained the inaccuracy as "just an error in timing as this is a cut and paste affidavit that I would do for a search warrant. She was ordered from the vehicle. I didn't ask her from the vehicle." (Tr. 3/5/12 at 79).

In his affidavit, Trooper Lora states that he "advised Ramos that I found it suspicious that she would travel to Vermont with someone she didn't really know to visit a friend that she did not really know in the middle of the week. Ramos agreed with me that her story did not make a lot of sense." (Doc. 15-1 at 4.). In fact, Defendant never advised or implied that she agreed that her story did not make a lot of sense.

Trooper Lora advised Judge Carroll that he called a canine unit only after Defendant had been issued a warning for speeding and had refused consent to search. In fact, he first advised dispatch that he would potentially need a canine unit at the commencement of his interview of Defendant in the cruiser, called for the unit in the

10

midst of the interview, and advised that he had a canine coming in the course of soliciting Defendant's consent.

Finally, in his affidavit, Trooper Lora did not advise Judge Carroll that both Defendant and her passenger had valid operator's licenses, no criminal history, and had both denied the presence of narcotics in the vehicle.

Judge Carroll signed the search warrant application at 11:39 p.m. Trooper Lora then returned to the barracks and conducted the search with Trooper Trudeau. At approximately 12:24 a.m. on January 15, 2010, nearly four hours after Trooper Lora initiated the traffic stop for speeding, VSP discovered cash in the glove compartment of Defendant's vehicle and a receipt dated January 14, 2010 from a store in New Jersey.[5] The search ended shortly thereafter.

Defendant and her passenger left the barracks without the money after VSP seized it and issued Defendant a receipt for it. Trooper Lora estimated that they left between 1:00 a.m. and 2:00 a.m. on January 15, 2010. After conferring with the Drug Enforcement Agency ("DEA"), VSP returned the money to Defendant at a later time.

## II.    Conclusions of Law and Analysis.

### A. Standard of Review.

In moving to suppress evidence in a criminal case, "[t]he movant . . . has the obligation to present evidence in court . . . designed to convince the court that his motion should be granted." *United States v. Thompson*, 409 F.2d 113, 117 (6th Cir. 1969); *United States v. Flores*, 2000 WL 1597880, at *2 (S.D.N.Y. Oct. 27, 2000). Once a defendant has established a potential basis for suppression, "the Government bears the burden of proving, by a preponderance of the evidence, that the officers' actions were lawful." *United States v. Torres*, 2011 WL 2209144, at *5 (S.D.N.Y. June 7, 2011) (quoting *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010)).

---

[5] Trooper Lora testified that the search of the vehicle revealed "a small black plastic bag located in the glove box, [which] contained approximately six-and-a-half dollars of currency along with some other items [including] a receipt from a store in New Jersey dated January 14." (Tr. 3/5/12 at 45). The search warrant inventory, however, identifies the amount of currency as $6,900. (Doc. 15-1 at 6).

## B. Whether Defendant's Fourth Amendment Rights Were Violated.

Defendant contends that after Trooper Lora examined her documents, established her identity, determined the absence of any warrants, and issued her a warning for speeding, he unreasonably detained her in violation of the Fourth Amendment. The government responds that Trooper Lora's actions during the stop did not violate Defendant's Fourth Amendment rights because any further detention was brief and narrowly tailored to investigation of circumstances Trooper Lora reasonably found suspicious.

### 1. The Initial Scope and Duration of the Vehicle Stop.

Defendant does not contest the lawfulness of the initial traffic stop of her vehicle for speeding. Accordingly, the court examines only what followed thereafter to determine whether it comported with constitutional requirements.

Pursuant to the Fourth Amendment, a law enforcement officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Traffic stops are analogous to investigatory *Terry* stops. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). The legality of investigatory stop is subject to a dual inquiry. *United States v. Sharpe*, 470 U.S. 675, 682 (1985). First, the court must determine whether the stop was justified at its inception by a reasonable suspicion that criminal activity has occurred or is about to occur. *Id.* Second, the court must determine whether the detention was "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* Here, only the second prong is at issue.

"During the course of a legal investigatory stop, if the officer develops an objective and particularized basis for suspecting additional wrongdoing, he is justified in continuing the detention" to investigate further. *United States v. Masterson*, 2009 WL 2365334, at *4 (D. Vt. July 29, 2009) (citing *United States v. Jenkins*, 452 F.3d 207, 214 (2d Cir. 2006) (concluding after the suspicion which justified the initial stop had been dispelled, odor of marijuana coming from the vehicle provided additional reasonable

12

suspicion of wrongdoing, and subsequent questioning about marijuana use was permissible)). Nonetheless, the scope and duration of any further detention must be both reasonable and tailored to the suspicion, *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995), and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

While there is no precise definition of a "reasonable suspicion," "the officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Wardlow*, 528 U.S. at 123-24. The Second Circuit has noted the level of proof required is "considerably less than proof of wrongdoing by a preponderance of the evidence." *Tehrani*, 49 F.3d at 58; *United States v. Sokolow*, 490 U.S. 1, 7 (1989). In order to demonstrate reasonable suspicion, "the subjective intentions or motives of the officer making the stop are irrelevant." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000).

In determining whether an officer has a reasonable suspicion, the court must look at the "totality of the circumstances," *United States v. Arvizu*, 534 U.S. 266, 273 (2002), and such inquiry must be made "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *Bayless*, 201 F.3d at 133; *Ornelas v. United States*, 517 U.S. 690, 699 (1996) (recognizing an officer is entitled to rely on his experience and expertise). When law enforcement suspects drug trafficking, "an officer's suspicion will be reasonable if, considering the totality of the circumstances surrounding the stop, the conduct would appear suspect to one familiar with the practice of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer." *United States v. Glover*, 957 F.2d 1004, 1010 (2d Cir. 1992).

In this case, upon stopping Defendant's vehicle, Trooper Lora immediately began to investigate the circumstances of Defendant's travel although he had no objective basis for doing so. He asked Defendant a number of questions about where she had been and where she was going. Defendant was not required to answer these questions although she

did so. The initial roadside encounter was thus primarily focused on whether there were any additional facts that might require additional investigation.

While it is true Trooper Lora's questioning detained Defendant longer than she might have been detained had the encounter been confined to merely writing a ticket or warning for speeding, any additional detention for this purpose at the initial stop was nominal consisting of no more than three minutes. During that time, Defendant was not in custody. *See Howes v. Fields*, 132 S. Ct. 1181, 1190 (2012) (holding that "the roadside questioning of a motorist who was pulled over in a routine traffic stop did not constitute custodial interrogation."); *Berkemer v. McCarty*, 468 U.S. 420, 436 (1984) (holding that while motorists subject to routine traffic stops do not generally feel free to leave they are not in custody for *Miranda* purposes).

Moreover, nothing prohibits a law enforcement officer from briefly asking questions unrelated to the reason for the stop. *See Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."); *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991) ("[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage—as long as the police do not convey a message that compliance with their requests is required.") (internal citations omitted); *Glover*, 957 F.2d at 1009 (no seizure found during initial police questioning that took place in public place where defendant was asked in a non-threatening manner about his travel and identification).

Based upon the foregoing, the court concludes that Trooper Lora's roadside questioning of Defendant while she was seated in her vehicle, which ranged beyond the questioning necessary for a routine traffic stop for speeding, was constitutionally permissible.

## 2. The Exit Order.

Three minutes into the stop, Trooper Lora ordered Defendant out of her vehicle which constituted not only a further detention but a further restraint on her freedom of movement. His objective grounds for doing so were that she did not appear to know she was still in Vermont, he found her explanation that she had been in Burlington visiting some friends vague, she was headed to Newark, New Jersey in a rental car, and both she and her passenger appeared excessively nervous.

Defendant argues that under Vermont law, any exit order at this point was unlawful as there was no safety concern or objective evidence of criminal activity to be investigated outside the vehicle such as sobriety exercises for a potentially impaired driver. *See State v. Sprague*, 2003 VT 20, ¶¶ 14-17, 175 Vt. 123, 824 A.2d 539 (holding that under Vermont Constitution an exit order is unlawful unless there are objective circumstances that "would cause a reasonable officer to believe it was necessary to protect the officer's, or another's, safety or to investigate a suspected crime.").[6]

As the government points out, however, federal law governs the lawfulness of the exit order even if given by a state officer in a state investigation. *See United States v. Pforzheimer*, 826 F.2d 200, 204 (2d Cir. 1987) (holding "federal law should apply to [a] federal criminal prosecution, even though the underlying investigation leading to prosecution was conducted solely by state officials."). Under federal law, "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable search and seizures." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977); *see also Mollica v. Volker*, 229 F.3d 366, 369 (2d Cir. 2000) ("[I]f a stop is lawful, passengers and drivers have no Fourth Amendment interest in not being ordered out of the stopped vehicle."). The *Mimms* Court cautioned, however, that "we do not

---

[6] The Vermont Supreme Court has recognized that "Article 11 of the Vermont Constitution provides greater protections for personal liberty than does the Fourth Amendment to the United States Constitution." *State v. Lamonda*, 2011 VT 101, ¶ 9, 30 A.3d 687, 689.

hold today that 'whenever an officer has an occasion to speak with the driver of a vehicle, he may also order the driver out of the car[.]'" *Id.* at 111 n.6.

Here, the exit order served to separate Defendant from her passenger while both were further questioned about facts Trooper Lora found suspicious and consistent with a drug run. Although a close question, the court concludes that, under federal law, the exit order was a constitutionally permissible expansion of Trooper Lora's *Terry* stop as it served a valid investigative purpose tailored to the suspicion at issue.

### 3. Further Detention After the Exit Order.

After issuing the exit order, provided he acted diligently, Trooper Lora was permitted to investigate facts that, based upon his training and experience, reasonably appeared suspicious. *United States v. Place*, 462 U.S. 696, 709 (1983). Although the objective evidence at this point was decidedly scant, consisting only of excessive nervousness,[7] lack of apparent luggage for a two day trip, non-specific responses regarding where she was travelling from and what was going on in Burlington, and a rental car, courts have held similar facts sufficient to warrant further investigation. *See Glover*, 957 F.2d at 1010-11 (defendant's heavy sweating, nervous shaking, and giving questionable answers during a police encounter, among other factors, contributed to a reasonable suspicion of criminal activity); *United States v. Soto*, 988 F.2d 1548, 1556 (10th Cir. 1993) (police observations of defendant acting nervous, visibly shaking, and being unable to provide the address of the vehicle's owner, who was defendant's uncle, gave rise to a reasonable suspicion to expand questioning during a traffic stop). However, because the evidence obtained roadside was so limited and was equally indicative of lawful activity, the nature, duration, and scope of Trooper Lora's expanded investigation into potential narcotics trafficking warrants close scrutiny.

After he ordered Defendant to sit next to him in his police cruiser, Trooper Lora repeatedly questioned Defendant about the circumstances of her travel, her relationship

---

[7] *See United States v. Gutierrez-Daniez*, 131 F.3d 939, 943 (10th Cir. 1997) (finding nervousness of "limited significance" because "most individuals will exhibit some signs of nervousness when approached by a police officer," but officer here was "able to contrast Defendant's behavior with that of the other individual.").

with her passenger, and confronted her with what he considered to be either inconsistencies or nonsensical elements of her story. He did this while he checked on the validity of her operator's license and her criminal record. Once he determined that Defendant's license was valid, that she had no outstanding warrants and no criminal record, and that he would issue her a warning for her speeding, the initial purpose of the stop was satisfied.

At this point, in order to detain Defendant further, Trooper Lora needed to be able to point to objective facts that required additional investigation. Defendant's vague and evasive statements regarding her monthly visits to her friend "Mirabelle" whose last name she did not know, her loose association with her passenger, and her lack of eye contact when questioned about the contents of the vehicle supplied those facts. The duration of the investigatory stop remained relatively brief, was directed to confirming or dispelling Trooper Lora's suspicions, and was coupled with an intent to have a canine sniff of Defendant's vehicle take place before sending Defendant on her way or detaining her further. Courts generally find the duration and scope of an investigatory stop in such circumstances lawful. *See Glover*, 957 F.2d at 1013 (thirty minute detention during an investigatory stop for questioning, background check, and awaiting arrival of a canine unit held reasonable); *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (forty-five minute detention after traffic stop, records check, questioning, and canine sniff held reasonable); *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994) (en banc) (hour detention following a traffic stop while waiting for the nearest canine unit found reasonable when the officer acted diligently); *United States v. Hardy*, 855 F.2d 753, 761 (11th Cir. 1988) (concluding fifty minute detention while awaiting a canine unit was reasonable).

Here, however, there is a complicating factor. Because Defendant's statements made inside the cruiser were the only reasonable justification for her further detention, the court must consider whether they were the product of custodial interrogation without *Miranda* warnings before deciding whether Defendant's further detention inside the police cruiser until the canine unit arrived was reasonable under the Fourth Amendment.

## C. Whether Defendant Was in Custody for *Miranda* Purposes.

A criminal defendant bears the burden of establishing that he or she was subjected to custodial interrogation. *See United States v. Cunningham*, 2012 WL 369923, at *3 (D. Vt. Feb. 3, 2012); *United States v. Davis*, 792 F.2d 1299, 1308 (5th Cir. 1986) (holding defendant "had the burden of proving that he was under arrest or in custody" when seeking suppression of statements); *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989) (affirming district court's dismissal of defendant's *Miranda* claim because defendant "failed to demonstrate that he was subjected to custodial interrogation").

Defendant contends that she was in custody when she was ordered out of her vehicle and required to sit in a police cruiser and submit to questioning. The government contends that any such questioning was not custodial in nature although it does not go so far as to claim that it was consensual.

Under *Miranda*, a law enforcement officer may not interrogate a suspect who has been taken "into custody" without first warning him that he:

> has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 479 (1966). If no warning is given to a suspect in custody, the prosecution may not use statements obtained during the interrogation in its case in chief. *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004).

The question of "whether a suspect is 'in custody' is an objective inquiry." *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011). "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave[.]" *Id.* (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of the degree associated with a formal arrest." *J.D.B.*, 131 S. Ct. at 2402 (quoting *Thompson*, 516 U.S. at 112).

In determining whether there is custodial interrogation, a court must "examine all of the circumstances surrounding the interrogation." *J.D.B.*, 131 S. Ct. at 2402 (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

> Those circumstances include, inter alia, the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion, . . . and, now, a juvenile suspect's age, if known to the officer or readily apparent[.] . . . The circumstances also include, and especially so in border situations, the nature of the questions asked.

*United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011) (internal citations omitted).

Again, in this case, whether there was custodial interrogation in the police cruiser presents a close call. On the one hand, Trooper Lora questioned Defendant on the side of I-91 in Brattleboro, in full view of passing vehicles albeit at night. *See Berkemer*, 468 U.S. at 438 ("[T]he typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view . . . diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse."); *Cruz v. Miller*, 255 F.3d 77, 83 (2d Cir. 2001) (citing *Berkemer* and noting "the public nature of the scene" of a traffic stop weighs against a custodial setting).

Moreover, "[m]ere police questioning does not constitute a seizure," *Muehler v. Mena*, 544 U.S. 93, 101 (2005), and "the solicitation of information concerning a person's identity and background does not amount to custodial interrogation prohibited by *Miranda v. Arizona*, 384 U.S. 436 (1966), whether that solicitation occurs before or after *Miranda* warnings are given." *United States v. Adegbite*, 846 F.2d 834, 838 (2d Cir. 1988).

Defendant was neither handcuffed during this stage of the questioning, nor was she threatened in any manner or exposed to any show of force or abusive language. *See United States v. Sugrim*, 732 F.2d 25, 28 (2d Cir. 1984) ("Factors which strongly suggest [a person is not free to leave] are, for example, the display of a weapon, physical

touching of the person by the officer and language or tone indicating a show of authority that may compel compliance with the officer's request."). At the end of the encounter, although she was handcuffed and transported to a police barracks where she was further detained, she was advised that she was not under arrest and would be released in the event that no contraband was found in her vehicle.[8]

The questioning of Defendant in the police cruiser lasted approximately thirty minutes, was conducted by a single officer, and was not a "marathon session designed to force a confession." *Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985); *see also Glover*, 957 F.2d at 1011, 1013 (noting that "[a] critical factor in evaluating the intrusiveness of a stop is the length of the detention".); *United States v. Lifshitz*, 2004 WL 2072468, at *8 (S.D.N.Y. Sept. 15, 2004) (holding "interview [that] was not overly long[,] lasting approximately 45 minutes to one hour" was non-custodial).

On the other hand, a reasonable person in Defendant's position would not feel free to leave after Trooper Lora ordered Defendant to accompany him to his cruiser. *See United States v. Valentine*, 657 F. Supp. 2d 388, 391 (W.D.N.Y. 2009) ("[t]he mere fact that [defendant] was not physically forced into the [police] vehicle does not mean that he could reasonably have believed that he had much choice in the matter."). The Second Circuit has held that "[t]he free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing *Miranda* custody." *Newton*, 369 F.3d at 670. Here, Trooper Lora did not tell Defendant that she was not under arrest, was free to leave at any time, or could refuse to answer his questions. *See United States v. Badmus*, 325 F.3d 133, 139 (2d Cir. 2003) (taking into consideration whether a suspect is told he is not under arrest in determining custody); *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) ("Decisions in [the Second Circuit] have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the

---

[8] This belated advisement does not materially alter the encounter that preceded it. *See United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993) (holding that handcuffed suspect placed in back seat of squad car was in custody for purposes of *Miranda* even though agents told him he was not under arrest) *cited with approval in Newton*, 369 F.3d at 676.

message that the defendant is not free to leave."). Indeed, Trooper Lora concedes Defendant was being detained for further investigation.

In the course of his questioning, Trooper Lora wore a uniform, *see United States v. Jin*, 2009 WL 2971365, at *7 (W.D.N.Y. Sept. 11, 2009), and sat in close proximity to Defendant. *See United States v. Brown*, 557 F.2d 541, 550-51 (6th Cir. 1977) ("The backseat of a patrol car is an inherently coercive setting for a confession" and "conforms in all respects to the 'incommunicado, police-dominated' atmosphere" which gives rise to the warnings required by *Miranda*); *United States v. Gallardo*, 2006 WL 680890, at *5 (D. Neb. Mar. 13, 2006) ("the fact that the trooper's conversation with the defendant occurred inside the trooper's patrol car weighs in favor of a finding that the atmosphere was 'police dominated.'") (internal citation omitted).

During much if not all of the questioning, Trooper Lora retained both Defendant's operator's license and that of her passenger, thereby hindering both of their departures. *See Glover*, 957 F.2d at 1008 (retention of person's identification is a factor that weighs in favor of finding a seizure);[9] *United States v. Lambert*, 46 F.3d 1064, 1068 (10th Cir. 1995) (holding that "when law enforcement officials retain an individual driver's license in the course of questioning him, that individual, as a general rule, will not reasonably feel free to terminate the encounter"); *United States v. Kisgyorgy*, 2010 WL 3323675, at *7 (D. Vt April 23, 2010) (noting that seizure may be found when law enforcement officer "maintained possession of the Defendant's driver license which was presumably the Defendant's sole form of identification"); *Tehrani*, 826 F. Supp. at 798-99 (factors that support conclusion that a reasonable person would not feel free to leave include "prolonged retention of a person's identification cards or other personal effects.").

---

[9] The court is mindful that Fourth Amendment cases addressing whether law enforcement activities constitute a seizure do not determine whether a person is in custody for purposes of the Fifth Amendment. *See Newton*, 369 F.3d at 673 ("This court, however, has specifically rejected Fourth Amendment reasonableness as the standard for resolving *Miranda* custody challenges."). However, because such cases address whether law enforcement has in some way limited a person's freedom of movement they have some relevance to the court's inquiry. *See Cowan v. Breen*, 352 F.3d 756, 763 (2d Cir. 2003) (the Supreme Court has made "clear that a Fourth Amendment seizure occurs 'when there is a governmental termination of freedom of movement *through means intentionally applied.*'") (citations omitted).

During the questioning, Trooper Lora called a canine unit in Defendant's presence, repeatedly reminded Defendant that a canine unit was en route, and told her that they would wait until it arrived. This unmistakably conveyed to a reasonable person in Defendant's circumstances that she was not free to leave until the canine search was completed. *See United States v. Finke*, 85 F.3d 1275, 1281 (7th Cir. 1996) ("We do not believe a person in [defendant's] position, who had just been told that a canine unit was being called, would feel free to get behind the wheel and drive away from the scene.").

Thereafter, Trooper Lora alluded to further delay and detention in the event Defendant continued to refuse to consent to a search after the canine alerted and he was forced to apply for a search warrant. *See United States v. Guarno*, 819 F.2d 28, 32 (2d Cir. 1987) (finding custody may result where "something . . . said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, . . . indicates that they would not have heeded a request to depart or allow the suspect to do so.'"); *see also* W. LaFave, 2 CRIM. PROC. § 3.10(b) (3d ed. Nov. 2011) ("A threat by the police to *obtain* a search warrant is not materially different from a claim that a warrant has already issued[.]").

When Defendant asked for her phone, Trooper Lora denied that request as he did her later request for her coat and cigarettes. *See United States v. Ellington*, 2008 WL 4951218, at *2 (N.D. Ill. Nov. 18, 2008) (concluding suspect was not in custody because, among other things, she "brought her personal belongings with her, including her purse and cell phone[.]") .

When Trooper Lora went to speak to Defendant's passenger, he made it clear that she was to remain behind in the cruiser, thereby confirming that he was limiting her freedom of movement. *See Pinto-Montoya v. Mukasey*, 540 F.3d 126, 132 (2d Cir. 2008) ("[A]n assertion of authority to restrain a person's freedom of movement by law enforcement officers would, in most instances, constitute a seizure.").

Finally, Trooper Lora used certain tactics that, while in themselves not unlawful, lent a coercive tone to the encounter. In the midst of questioning Defendant, he called in her name and that of her passenger to his dispatcher on several occasions, told the

dispatcher to start a "card for suspicious," and asked for assistance from other units. He also told Defendant that he had received a different version of the events from her passenger although in fact he had not asked Defendant's passenger about "Mirabelle" and Defendant's passenger had confirmed that Defendant was visiting her friends in Burlington, that the two did not know each other well, and that there was nothing in the vehicle of concern. He also confronted Defendant regarding the credibility of her statements, reiterated the same questions he had asked her previously, and repeatedly asked for consent in the face of her clear and unequivocal refusal – tactics that would prompt a reasonable person to conclude that the interview would not cease until Trooper Lora obtained the responses he desired. *See United States v. Jones,* 523 F.3d 1235, 1241 (10th Cir. 2008) (ruling that in making custody determination court must determine whether encounter was marked by "prolonged accusatory questioning . . . likely to create a coercive environment from which an individual would not feel free to leave."); *United States v. Johnson,* 64 F.3d 1120, 1126 (8th Cir. 1995) (custody analysis examines whether there has been prolonged, coercive, accusatory questioning, or whether police have employed subterfuge in order to induce self-incrimination).

The totality of the evidence supports a conclusion that Defendant was not free to leave from the moment she was ordered into Trooper Lora's cruiser until she was released from the police barracks the following morning. During the interview in the police cruiser, a reasonable person in Defendant's circumstances would have understood that her freedom of movement was severely constrained commensurate with a formal arrest, and the "initial stop and investigative detention had evolved into a situation indistinguishable from an arrest[.]" *Gilles v. Repicky,* 511 F.3d 239, 246 (2d Cir. 2007). Although a close question, a contrary conclusion would mean that it is constitutionally permissible for a law enforcement officer to order a suspect in a routine traffic stop to sit and remain in his cruiser and submit to approximately thirty minutes of accusatory questioning, well beyond that necessary for a routine traffic stop, without the ability to leave, communicate with others, or access personal belongings, and without the benefit of *Miranda* warnings. As the Second Circuit has observed, "*Miranda* itself defined

'custodial interrogation' as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Newton*, 369 F.3d at 671 (quoting *Miranda*, 384 U.S. at 444). Trooper Lora's questioning of Defendant in his police cruiser satisfies that definition.

Because it is undisputed that Defendant was not read her *Miranda* rights prior to custodial interrogation in Trooper Lora's cruiser, any statements she made in response to questioning inside the police cruiser must be suppressed.

Defendant's motion to suppress is therefore GRANTED insofar as it pertains to her statements inside the police cruiser.

### D. Detention for the Purpose of Awaiting the Canine Unit.

Having determined that Defendant's statements inside the police cruiser were obtained in violation of *Miranda*, the court must determine whether the approximately thirty-five minute detention of Defendant in the absence of those statements until a canine unit arrived and a canine search was completed was nonetheless reasonable under the Fourth Amendment.

In *Illinois v. Caballes*, 543 U.S. 405 (2005), the Supreme Court held that "the use of a well-trained narcotics-detection dog—one that does not expose noncontraband items that otherwise would remain hidden from public view—*during a lawful traffic stop*, generally does not implicate legitimate privacy interests. *Id.* at 409 (emphasis supplied) (noting that "[i]n this case, the dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation."). The Court correspondingly noted that:

> A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission. In an earlier case involving a dog sniff that occurred during an unreasonably prolonged traffic stop, the Illinois Supreme Court held that use of the dog and the subsequent discovery of contraband were the product of an unconstitutional seizure. *People v. Cox*, 202 Ill.2d 462, 270 Ill.Dec. 81, 782 N.E.2d 275 (2002). [(finding a fifteen minute delay prior to conducting a canine sniff constituted an unlawful extension of a routine traffic stop)]. We may

assume that a similar result would be warranted in this case if the dog sniff had been conducted while respondent was being unlawfully detained.

*Id.* at 407-08; *see also United States v. Garrett*, 139 Fed. App.x, 720, 722-23 (7th Cir. 2005) (finding that *Caballes* framework did not apply because it was not clear from the record that the dog sniff occurred within the time period reasonably required to complete the traffic stop and noting "it does not matter how quickly a dog arrives after being called because a suspect might be illegally detained by the time of the call.").

In this case, in the absence of the incriminating statements made by Defendant in the police cruiser, there was no reason to delay her until a canine unit arrive solely based upon the limited evidence obtained by Trooper Lora while he questioned her roadside. In that brief three minute interview, Trooper Lora ascertained only that she had been in Burlington for a couple days visiting friends, she was headed to Newark, New Jersey in a rental vehicle, and both she and her passenger were nervous. Although these facts may have warranted further investigation, they did not justify forcing Defendant to wait until a canine unit arrived to conduct a search. It is beyond dispute that the canine unit did not arrive within the time necessary to satisfy the purpose of the initial stop. Accordingly, the canine search in this case was the product of an unlawful detention and the fruits of it are inadmissible under *Caballes* and its progeny.

Defendant's motion to suppress the evidence of the canine search is therefore GRANTED.

### E. The Search Warrant.

Defendant challenges the search warrant on two grounds. First, she contends that the issuing judge was misled because the supporting affidavit was based on Trooper Lora's statement that he requested Defendant join him in his cruiser and advised her that she did not need to comply, when in fact he ordered her out of her vehicle and did not inform her that she did not have to do so. Second, she argues that the warrant was not supported by probable cause.

While conceding that Trooper Lora made at least one inaccurate statement in his search warrant affidavit, the government argues the court need not address the warrant

because, under federal law, Trooper Lora would have been justified in searching the car immediately after the canine's alert pursuant to the federal "automobile exception" to the warrant requirement.[10] Because the court has concluded that the canine search was the product of an unlawful detention, and because in the absence of the canine sniff probable cause to search does not exist, the "automobile exception" to the warrant requirement does not apply.

Moreover, the court need not determine whether Trooper Lora purposefully or recklessly mislead Judge Carroll because the lack of probable cause with or without the inaccurate statement or statements is readily apparent.

In the Second Circuit, "[w]hen an affidavit in support of a search warrant contains information which is in part unlawfully obtained, the validity of a warrant and search depends on whether the untainted information, considered by itself, establishes probable cause for the warrant to issue." *United States v. Marchand*, 564 F.2d 983, 993 (2d Cir. 1977). In so ruling, the Second Circuit pointed out that "[o]ther circuits have held squarely that the presence of illegal evidence in affidavits presented for a search warrant does not prevent a finding of probable cause sustainable on other grounds." *Id.* at 994 (collecting cases).

Here, in the absence of the canine search and Defendant's statements made inside the cruiser, the search warrant would be based only upon the limited evidence Trooper Lora gleaned in three minutes while questioning Defendant roadside. Nothing Defendant did or said during that brief encounter would lead a reasonable person to believe that evidence of criminal activity would be found in her vehicle and no reasonable judge or magistrate would issue a warrant to search a motor vehicle on that basis. *See Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (probable cause may be found "where the facts and circumstances within [law enforcement officer's] knowledge and of which they

---

[10] The Fourth Amendment does not require the police to obtain a search warrant to search an automobile when they have probable cause to believe it contains contraband or evidence of criminal activity. *Arkansas v. Sanders*, 442 U.S. 753, 760 (1979); *Chambers v. Maroney*, 399 U.S. 42, 52 (1970).

had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.").

Defendant's motion to suppress the evidence derived as a result of the search warrant is also GRANTED.

## CONCLUSION

For the reasons stated above, the court hereby GRANTS Defendant's motion to suppress evidence (Doc. 14) in its entirety.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this _21ˢᵗ_ day of May, 2012.

*/s/Christina Reiss*

Christina Reiss, Chief Judge
United States District Court